FILED
IN CLERKS OFFICE
2023 AUG 31 PM 1: 54

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JASON COLANTUONI,<br><br>Defendant | Criminal No.<br>23cr10237<br><br>Violation:<br><br>Count One: Conspiracy to Commit Price Gouging<br>(18 U.S.C. § 371) |

## INFORMATION

At all times relevant to this Information:

### General Allegations

1. Defendant JASON COLANTUONI was a resident of Massachusetts.

2. Company A was a limited liability company formed in Florida by Individual-1 on and about March 11, 2020 in response to the COVID-19 pandemic.

3. Individual-1 was a resident of Florida. Individual-1 co-owned Company A and served as its chief executive officer.

4. Individual-2 was a resident of Massachusetts. Individual-2 co-owned Company A and served as its head of sales.

5. COLANTUONI, a longtime friend of Individual-1 and Individual-2, was a representative of Company A. Beginning in and around March 2020 and extending through in and around April 2020, COLANTUONI conspired with Individual-1 and Individual-2 to use Company A to purchase personal protective equipment (PPE) and resell that PPE to hospitals at excessive prices, as further set forth below.

1

## Overview of the Conspiracy

6. COLANTUONI began conspiring with Individual-1 and Individual-2 to use Company A to exploit the critical need of hospitals and healthcare workers for PPE during the initial weeks of the COVID-19 pandemic. Through Company A, the co-conspirators accumulated PPE, including N95 respirators, from various sources, including online marketplaces such as eBay, as well as other individuals. Company A then sold the N95 respirators to hospitals at prices in excess of the prevailing market price. These hospitals included hospital systems and Veterans Affairs Medical Centers located in Massachusetts and elsewhere.

7. On and about March 18, 2020, the President issued Executive Order 13909, *see* 85 Fed. Reg. 16,277, invoking the powers vested in the President by the Defense Production Act of 1950, 50 U.S.C. §§ 4501 *et seq.* (the "Act"). The Act authorized the President to, among other things, "allocate materials, services, and facilities in such a manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." 50 U.S.C. § 4511(a)(2). The President was permitted to exercise this authority "to control the general distribution of any material in the civilian market" if the President found "(1) that such material is a scarce and critical material essential to the national defense, and (2) that the requirements of the national defense for such material cannot otherwise be met without creating a significant dislocation of the normal distribution of such material in the civilian market to such a degree as to create appreciable hardship." 50 U.S.C. § 4511(b).

8. The Act further provided that "no person shall accumulate . . . for the purpose of resale at prices in excess of prevailing market prices, materials which have been designated by the President as scarce materials or materials the supply of which would be threatened by such

2

accumulation." 50 U.S.C. § 4512.  The Act required the President to publish, including in the Federal Register, "every designation of materials the accumulation of which is unlawful," and authorizes the President to "prescribe such conditions with respect to the accumulation of materials in excess of the reasonable demands of business, personal, or home consumption as he deems necessary to carry out the objectives of this chapter." *Id.*

9. On and about March 23, 2020, the President issued Executive Order 13910, delegating to the HHS Secretary the President's authority under 50 U.S.C. § 4512 to prevent the excess accumulation of certain "health and medical resources necessary to respond to the spread of COVID-19 within the United States." *See* Fed. Reg. 17,001.

10. On and about March 25, 2020, pursuant to the authority granted under 50 U.S.C. § 4512 and Executive Order 13910, the HHS Secretary, by public notice, *see* 85 Fed. Reg. 17592, designated 15 categories of health and medical resources under the Act as scarce materials and the supply of which would be threatened by accumulation in excess of reasonable demands of business, personal, or home consumption, or for the purpose of resale at prices in excess of prevailing market prices, including N95 filtering facepiece respirators.

11. "N95" was a designation assigned to certain types of filtering facepiece respirators manufactured in the United States.  An N95 respirator was designed to achieve a very close facial fit and filter out at least 95% of airborne particles, including bacteria and viruses.  In connection with the COVID-19 pandemic, the CDC recommended that health care workers use N95 filtering facepiece respirators in hospitals and other medical treatment environments.

12. For health care workers during the first several months of the COVID-19 pandemic, N95 respirators provided critical protection against a potentially deadly virus.  This led to

3

unprecedented demand for N95 respirators, and health care providers had difficulty obtaining the N95 respirators they needed from their traditional suppliers.

13. COLANTUONI's role in the conspiracy included purchasing N95 respirators on behalf of Company A, storing the N95 respirators at his residence, and handling shipping and delivery of the N95 respirators to hospitals. COLANTUONI provided his residence as a workspace and storage area for Company A and set up Company A's website and email addresses for the co-conspirators.

14. COLANTUONI agreed to allow Individual-2 to use COLANTUONI's name while conducting business on behalf of Company A, including allowing Individual-2 to use a Company A email address in COLANTUONI's name. This allowed Individual-2 to conceal his identity and his involvement with Company A.

15. COLANTUONI conspired with Individual-1 and Individual-2 to use Company A to accumulate N95 respirators from various sources, including online marketplaces such as eBay, as well as other individuals. For example, on and about March 19, 2020, Company A purchased 24 boxes of N95 respirators for $2,479.99, or approximately $3.44 per mask.

16. Prior to the COVID-19 pandemic, the hospitals to which Company A sold N95 respirators made by a leading manufacturer typically paid approximately $0.44 to $0.70 per respirator. That leading manufacturer's published list price for its most common N95 respirator models ranged from $0.63 to $3.11 in 2020. The manufacturer did not raise the prices for its N95 respirators in March 2020 through April 2020.

17. Company A, in contrast, offered to sell N95 respirators to hospitals for as much as $11.95 per mask. Company A initially offered N95 respirators to hospitals on the following scale:

4

  a. 1,000 N95 respirators for $11.95 each;

  b. 2,000 N95 respirators for $10.95 each;

  c. 5,000 N95 respirators for $9.95 each; and

  d. 50,000 N95 respirators for $8.95 each.

18. Hospital 1, a hospital located in Massachusetts, paid Company A approximately $151,415 for more than 600 boxes of N95 respirators. On and about April 17, 2020, a representative of Hospital 1 contacted law enforcement with a list of the prices Hospital 1 was accustomed to paying for various PPE, citing pre-pandemic prices for N95 respirators of $0.53 each. Hospital 1 reported that Company A charged "$5.50+ (on average)" per respirator, and that Hospital 1 had never done business with Company A prior to the pandemic.

19. Company A sold approximately 1,000 boxes of N95 respirators to various hospitals during the relevant period, with each box containing 20 or 30 respirators. The weighted average price (*i.e.*, average price across the various models of respirators, weighted by the quantity of each model purchased or sold) for Company A's purchases of N95 respirators was approximately $4.48 per respirator. The weighted average price for Company A's sales of N95 respirators to hospitals was approximately $9.91 per respirator.

20. Communications between COLANTUONI and others showed that the co-conspirators understood that their sales of N95 respirators constituted price gouging.

21. For instance, on and about April 1, 2020, COLANTUONI texted Individual-1 and Individual-2 the following about "loose" masks that were not in the manufacturer's packaging:

  COLANTUONI: should be able to make back like 4200 on them, write the rest off as donations. listen if this goes bad at all with price gouging or

> > anything we will need to show some donations
>
> ...
>
> INDIVIDUAL-1: Donations don't offset breaking the law
>
> COLANTUONI: Better than nothing!!
> And I'm pretty sure if you faced price gouging charges or fines a good lawyer could show donations to offset it

22. On and about April 9, 2020, Individual-3, a Company A sales representative, warned COLANTUONI, Individual-1, and Individual-2, about price gouging and law enforcement efforts relating to price gouging. Individual-3 texted COLANTUONI, Individual-1, and Individual-2: "You gotta be careful man" because a "friend talked to a person he knows at the fbi" and "[t]hey are going to audit every transaction." Individual-1 and Individual-2 dismissed the warnings, and Individual-3 responded: "Yes they are letting it go because people are dying / But they will jail or heavily fine people." COLANTUONI replied: "'Price gouging' is open for interpretation. And isn't a crime lol / It's a civil fine." COLANTUONI added: "Companies are responsible for hundreds of deaths in some cases and not 1 person goes to jail for 1 second."

23. On and about April 17, 2020, COLANTUONI texted with Individual-4, another Company A sales representative. In the texts, COLANTUONI described some of his work for Company A:

> Ive done buying and delivery such
>
> And [Individual-2] using my name because he can't use his so my names all over this price gouging haha
>
> I was able to buy a bunch of masks in March that we sold at a 5-7$ markup
>
> It's up to [Individual-1] for what they want to hook me up with

## Object and Purpose of the Conspiracy

24. The object of the conspiracy was to commit price gouging in violation of the Defense Production Act of 1950, 50 U.S.C. §§ 4501 *et seq.*, by accumulating N95 respirators during the COVID-19 pandemic for the purpose of reselling those respirators to hospitals in excess of the prevailing market price. The principal purpose of the conspiracy was to make money and conceal the actions of the co-conspirators from law enforcement.

## Manner and Means of the Conspiracy

25. Among the manner and means by which COLANTUONI and coconspirators carried out the conspiracy were the following:

   a. Individual-1 and Individual-2 forming Company A to use as a vehicle to profit from the critical need of hospitals and healthcare workers for PPE during the COVID-19 pandemic.

   b. Individual-2 recruiting COLANTUONI to work for Company A.

   c. COLANTUONI allowing Individual-2 to use COLANTUONI's name while conducting business on behalf of Company A, to conceal Individual-2's identity and involvement with Company A.

   d. COLANTUONI and Individual-1 accumulating PPE, including Company B N95 respirators, from various sources, including online marketplaces such as eBay, and individuals who were able to obtain respirators from manufacturers in China.

   e. COLANTUONI storing accumulated PPE at his residence and shipping it to customers.

      f.      COLANTUONI receiving reimbursement for his purchases of PPE on behalf of Company A.

      g.      COLANTUONI, Individual-1, and Individual-2 emailing and calling contacts at hospitals supplied by Individual-2, in order to sell the PPE they had accumulated to these hospitals.

      h.      Individual-1 and Individual-2, through Company A, marking up the price of the PPE sold to the hospitals to maximize their profit on the resale of the PPE.

<u>Overt Acts in Furtherance of the Conspiracy</u>

26.    From in and about March 2020 through in and about April 2020, COLANTUONI and co-conspirators committed and caused to be committed the following overt acts, among others, in furtherance of the conspiracy:

      a.      On and about March 10, 2020, an email was sent in COLANTUONI's name to a representative of Hospital-1, stating that COLANTUONI was "referred" by Individual-2 and asking if the representative was "looking for N95 protective masks." The email added that they "have about 10,000 [leading manufacturer] brand N95 masks left, with a lead time of 1-2 weeks."

      b.      On and about March 18, 2020, Company A received $56,400 from Hospital 1 for the purchase of 200 boxes of N95 respirators (30 per box), at a price of $9.40 per respirator.

## COUNT ONE
### Conspiracy to Commit Price Gouging
### (18 U.S.C. § 371)

The United States Attorney charges:

27. The United States Attorney re-alleges and incorporates by reference paragraphs 1-26 of this Information.

28. From in and about March 2020 through in and about April 2020, in the District of Massachusetts and elsewhere, the defendant,

### JASON COLANTUONI,

conspired with Individual-1, Individual-2, and others to commit an offense against the United States, to wit, price gouging in violation of the Defense Production Act, 50 U.S.C. §§ 4512, 4513, that is, willfully accumulating for the purpose of resale at prices in excess of prevailing market prices, materials which had been designated by the President as scarce materials or materials the supply of which would be threatened by such accumulation.

All in violation of Title 18, United States Code, Section 371.

JOSHUA S. LEVY
Acting United States Attorney
District of Massachusetts

_____
WILLIAM B. BRADY
HOWARD A. LOCKER
Assistant United States Attorneys

District of Massachusetts: August 31, 2023

9